MAINE SUPREME JUDICIAL COURT ,                          Reporter of Decisions
Decision:    2025 ME 80
Docket:      Cum-24-301
Argued:      April 9, 2025
Decided:     August 19, 2025

Panel:       STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

## STATE OF MAINE

v.

## GABRIEL R. MCKUSICK

LAWRENCE, J.

[¶1]  Gabriel R. McKusick appeals from a judgment of conviction for creating a police standoff entered by the trial court (Cumberland County, *O'Neil, J.*) following a jury trial.  McKusick argues that the court erred in its interpretation of "barricaded" under 17-A M.R.S. § 517(1)(A) (2025), and that insufficient evidence existed for the jury to find beyond a reasonable doubt that the State had proved two out of the four elements required by the statute.  We conclude that the court did not err in its interpretation of "barricaded" and that sufficient evidence existed for the jury to find that the State proved all elements beyond a reasonable doubt.  We therefore affirm the court's judgment.

## I. BACKGROUND

[¶2] Viewed in the light most favorable to the verdict, the jury could have found the following facts beyond a reasonable doubt. *See State v. Hansen,* 2020 ME 43, ¶ 2, 228 A.3d 1082.

[¶3] On the evening of June 23, 2023, a man entered a Burger King drive-thru lane and ordered food from his vehicle. When the man pulled up to the cashier's window and paid, the cashier noticed the man touch a firearm in the front seat of his car. As he touched the firearm, which looked like an assault rifle with orange tape around the rifle butt, the man said to the cashier, "Don't worry about that, I'll get you later." After the man drove away, the cashier called 9-1-1 because she was concerned that the man would come back and hurt her. The cashier told the 9-1-1 operator what the man said to her and provided a description of the man, his car, the gun, and the car's license plate number.

[¶4] After receiving the information from dispatch, two police officers arrived and found the man, whom they identified as McKusick, sitting inside his car, which was in the parking lot adjacent to the Burger King. The officers then engaged in a high-risk stop of McKusick's vehicle.[1] Because the officers

---

[1] A high-risk stop, also called a "felony stop," involves an effort by law enforcement to mitigate potential risk when there is a suspicion that the occupant of a vehicle is armed and dangerous.

believed that McKusick had a gun in his car and was dangerous, they did not approach his vehicle and instead stayed back a safe distance, activated their cruisers' emergency lights, and gave verbal orders to McKusick, while keeping their guns trained on him.

[¶5] The officers first ordered McKusick to turn off the car and throw the keys out the window; McKusick pulled the car forward about ten or fifteen feet, stopped, turned the car off, and threw his keys out the window. The officers then ordered McKusick to exit his vehicle, but he refused to do so.

[¶6] Over the next couple of hours, officers continued to order McKusick to get out of his car, McKusick continued to refuse to do so, and he instead chose to rant and yell vulgarities at the officers. During the confrontation, more officers arrived, and eventually at least a dozen officers were present at the scene, including a negotiator and SWAT team personnel.

[¶7] The negotiator spoke with McKusick, attempting to coax him out of the car. When McKusick would not voluntarily exit his vehicle, an officer shot several rounds of projectiles containing chemical agents through McKusick's car windows to try to pressure McKusick to get out of his car. About two and a half hours after the confrontation began, and about thirty minutes after the first chemical agent was fired into McKusick's car, officers threw a noise flash

4

diversionary device into the car, approached McKusick's vehicle, pulled him out of his car, and arrested him. In the front seat of McKusick's car, police found an AR-15 rifle with extra magazines taped to it, matching the description that the cashier provided.

[¶8] On June 26, 2023, McKusick was charged by criminal complaint with criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. §§ 209, 1604(5)(A) (2025); creating a police standoff (Class E), 17-A M.R.S. § 517; and refusing to submit to arrest or detention (Class D), 17-A M.R.S. § 751-B(1)(B) (2025). McKusick was indicted by a grand jury on these charges on August 11, 2023.

[¶9] The court held a jury trial on May 29, 2024. At the trial, the jury heard testimony from the Burger King cashier, three police officers who responded to the scene, and an evidence technician who photographed the scene. The court admitted fifteen exhibits from the State in evidence. After the State rested, McKusick made a motion for judgment of acquittal under M.R.U. Crim. P. 29(a), arguing that insufficient evidence existed to support convictions for either the police-standoff charge or the criminal-threatening charge. The court denied this motion.

[¶10]  The jury found McKusick guilty of creating a police standoff and not guilty of criminal threatening and refusing to submit to arrest or detention. That same day, the court sentenced McKusick to four months and fifteen days of incarceration in the Cumberland County Jail, giving McKusick credit for having already served the time.

[¶11]  On June 12, 2024, McKusick filed a renewed motion for acquittal under M.R.U. Crim. P. 29(b), arguing that there was insufficient evidence for the jury to find that McKusick barricaded himself in the vehicle under the common definition of the word "barricade," and that there was insufficient evidence for the jury to find that the State had proved the element of 17-A M.R.S. § 517 that McKusick did not leave his car within a half hour after being ordered to do so. The court denied the motion, concluding that there was sufficient evidence for the jury to rationally find that under the ordinary meaning of the word, McKusick "barricaded" himself, and that there was sufficient evidence for the jury to rationally find that the time between McKusick's being ordered to leave his vehicle and his arrest was greater than a half hour.  McKusick timely appealed.  *See* M.R. App. P. 2B(b)(2)(B).

## II. DISCUSSION

[¶12]  McKusick argues that the court erred in its interpretation of the word "barricaded" as that term is used in 17-A M.R.S. § 517(1)(A), and that there was insufficient evidence for the jury to find that the State had proved two out of the four elements required by the police-standoff statute.  We address each of McKusick's arguments in turn.

### A.    Definition of "Barricaded"

[¶13]   McKusick argues that the court erred in its interpretation of "barricade" as that term is used in the statute.  We conclude that the court properly instructed the jury to use the plain meaning of the word "barricaded," that the court applied the plain meaning in denying McKusick's motion for judgment of acquittal, and that the plain meaning was consistent with the use of the word in the statute.  Accordingly, the court did not err.

[¶14]  We review issues of statutory interpretation de novo. *State v. Ray*, 2025 ME 29, ¶ 5, 334 A.3d 663.  We first look to the plain meaning of the statute's language in the context of the statutory scheme.  *Id.*  If the language is ambiguous, we look to relevant legislative history to discern the Legislature's intent.  *Id.*

[¶15]  Title 17-A M.R.S. § 517(1) provides:

**1. Creating police standoff.** A person is guilty of creating a police standoff if that person:

A. Is in fact barricaded as a result of the person's own actions;

B. Is or claims to be armed with a dangerous weapon;

C. Is instructed by a law enforcement officer or law enforcement agency, either personally, electronically or in writing, to leave the barricaded location; and

D. Fails in fact to leave the barricaded location within ½ hour of receiving the instruction as described in paragraph C from a law enforcement officer or law enforcement agency.

As noted by the court and both parties, the statute does not define "barricaded."[2] *See* 17-A M.R.S. § 2 (2025).

[¶16] Dictionaries define "barricade" as a noun to mean "something that serves as an obstacle; a barrier," *Barricade*, American Heritage Dictionary (5th ed. 2012), and "any barrier or obstruction," *Barricade*, Webster's New World College Dictionary (5th ed. 2016). Dictionaries define "barricade" as a verb to mean "to close off or block with a barricade; to shut (oneself) in by

---

[2] Because the statute does not define "barricaded," the parties agreed that the court should instruct the jury to use the "ordinary definition" of the word, and so the court did not supply a specific definition to the jury. In its order denying McKusick's renewed motion for judgment of acquittal, the court, applying the "ordinary day-to-day meaning" of the word, concluded that McKusick's "remaining in the car with his weapon after being ordered to exit constituted creating a barrier between himself and law enforcement and thus was a barricade."

means of a barricade, as for protection or privacy," *Barricade*, American Heritage Dictionary (5th ed. 2012), "shut (oneself or someone) into a place by blocking all the entrances," *Barricade*, New Oxford American Dictionary (3d ed. 2010), and "to shut in or keep out with a barricade; to put up barricades in; obstruct," *Barricade*, Webster's New World College Dictionary (5th ed. 2016). These definitions suggest that to barricade oneself requires the presence of a physical barrier between oneself and others that bars or impedes access. *See also People v. Montoya*, 555 P.3d 1057, 1067 (Colo. App. 2024) ("[B]arricading constitutes a physical impediment to entry.").

[¶17]  Further, the plain meaning of "barricaded" must be understood in the context of the statutory scheme. *See Ray*, 2025 ME 29,¶ 5, 334 A.3d 663. Title 17-A M.R.S. § 517(1)(A) provides that a person must be "barricaded as a result of the person's own actions."  Caselaw from outside of Maine sheds light on how a person's own actions help contour a court's understanding of the ordinary meaning of the word "barricaded."

[¶18]  In *Grant v. Winik*, the United States District Court for the Eastern District of Pennsylvania concluded that it was not unreasonable for an officer to determine that an individual was *not* barricaded because the individual "did not tell the officers to stay out or threaten to harm himself, or another; in fact,

[the individual] did not respond to the officers at all." 948 F. Supp. 2d 480, 503 (E.D. Pa. 2013). The court emphasized that the individual "had not communicated in any way that he would resist the officers if they came into his apartment." *Id.* at 513.

[¶19] Relatedly, other courts have emphasized resistance and hostility toward law enforcement officers as conduct commonly exhibited by a person who is barricaded. In *State v. Patton*, the Delaware Superior Court referred to a defendant as "barricaded" and stated that the police "observed Defendant seated behind the steering wheel of his truck yelling at the officers," the defendant cursed at the police, and the defendant "yelled at police to shoot him." 2001 WL 112074, at *1, *4 (Del. Super. Ct. Jan. 19, 2001). Moreover, in *Branderhorst v. Newton*, the United States District Court for the District of Oregon described a person as "barricaded" when the individual "remained in the driver's seat of his vehicle with the windows up, . . . acted in a hostile and menacing manner, and appeared to be under the influence of narcotics, . . . and police became concerned that the individual was preparing himself to fight or otherwise use violence to evade capture." No. 23-cv-01198, 2024 WL 4495163, at *2, *6 (D. Or. July 25, 2024) (alterations and quotation marks omitted); *see also* Int'l Ass'n of Chiefs of Police Law Enf't Pol'y Ctr., *Response to Barricaded*

*Individuals* 9-10 (May 2020) ("[A] barricaded individual is someone who is the focus of a law enforcement intervention effort, has taken position in a physical location that does not allow immediate law enforcement access, and is refusing law enforcement orders to exit [that location]." (emphasis omitted)).

[¶20]  Likewise, by its use of the phrase "as a result of the person's own actions," subsection 1(A) of section 517 demonstrates that the meaning of "barricaded" under the statute requires consideration of a person's conduct in creating a barricade.  Accordingly, "barricaded," as the term is used in the statute, requires a physical barrier in addition to evidence of conduct manifesting an objective to create and maintain such a barrier to make oneself inaccessible.  As illustrated by the caselaw cited above, such evidence often consists of, inter alia, oppositional, confrontational, hostile, or aggressive conduct toward law enforcement officers that impedes law enforcement efforts to safely remove the suspect from behind the physical barrier, thus making the suspect inaccessible.

[¶21]  We conclude that this meaning of barricaded is unambiguous and thus we need not resort to the legislative history of the statute for guidance.[3]

---

[3] Although we conclude that we need not address the legislative history of the statute, we note that a change to the wording of the statute when it was recodified as a criminal offense was intended to broaden the types of places where a person could be barricaded to make clear that a person can be barricaded in a vehicle. *See* Comm. Amend. A to L.D. 179, No. H-163 (128th Legis. 2017). *Compare*

We therefore move on to consider whether the evidence was sufficient to show that McKusick barricaded himself as that term is used in 17-A M.R.S. § 517(1)(A).

**B.    Sufficiency of the Evidence as to 17-A M.R.S. § 517(1)(A)**

[¶22]  McKusick contends that the evidence was insufficient for the jury to find that he barricaded himself as that term is used in 17-A M.R.S. § 517(1)(A).  Applying the plain meaning of the word "barricaded," we conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that McKusick barricaded himself as a result of his own actions.

[¶23]  The evidence shows that McKusick kept himself shut inside his car with the doors closed, thus interposing a physical barrier between him and law enforcement officers until the officers threw the noise flash diversionary device into his car and dragged him out.  Throughout the confrontation, McKusick continually yelled at the officers and shouted strings of vulgar names, phrases, and obscenities.  During the time that he refused to exit his vehicle, McKusick told law enforcement officers to come and get him; at one point he even asked,

---

P.L. 2017, ch. 86, § 1 (effective Nov. 1, 2017) (codified at 17-A M.R.S. § 517 (2025)) (requiring that the suspect be in a "barricaded location"), *with* 25 M.R.S. § 3801 (2016), *repealed by* P.L. 2017, ch. 86, § 2 (effective Nov. 1, 2017) (requiring that the suspect be in a "barricaded structure"). McKusick does not argue that a person in a vehicle can never be considered to be "barricaded."

"Why don't you just shoot me?" and immediately proceeded to quickly move his hands around in a provocative manner. This all occurred while law enforcement viewed McKusick as an ongoing threat to the public.[4] Notwithstanding McKusick's limited compliance with police officers' orders (i.e., rolling down the driver side window of his car, throwing the keys out the window, and keeping his hands outside the car for most of the time that he refused to leave his car), McKusick used his car to maintain a physical barrier between himself and the officers; exhibited defiant, oppositional, and aggressive behavior toward the police; and posed a potential threat to the public. The combined effect of McKusick's remaining entrenched in his car, together with his volatile behavior, impeded law enforcement's efforts to safely remove him from the vehicle. McKusick's conduct thus clearly met the plain meaning of "barricaded" as that term is used in the statute.

---

[4] Indeed, law enforcement would have to have reasonable articulable suspicion to initiate a stop or seizure of a person in a vehicle. *See State v. Wilcox*, 2023 ME 10, ¶ 13, 288 A.3d 1200. Here, the police officers were given a description of McKusick, were told that the Burger King cashier had seen an assault rifle inside McKusick's vehicle, and were operating under the belief that McKusick had threatened the cashier with a dangerous weapon. Accordingly, the officers had reasonable articulable suspicion that criminal conduct had occurred. Further, upon McKusick's obdurate refusal to leave his vehicle and the assault rifle therein, he posed a threat to public safety that generated reasonable articulable suspicion that criminal conduct was occurring or about to occur. *See id.* These circumstances further demonstrate how McKusick barricaded himself within the meaning of 17-A M.R.S. § 517(1)(A), because the totality of his conduct together with the physical barrier of his vehicle obstructed and impeded law enforcement's ability to safely reach McKusick and remove him from his car.

[¶24]  Upon consideration of these facts and the law, we disagree with McKusick's contention that he was not barricaded because he was just enjoying a meal while sitting in his car and simply minding his own business.  Given the evidence showing law enforcement's particularized knowledge of the earlier threat that McKusick made to the cashier combined with the potential threat he posed by using his car to physically obstruct law enforcement's access to him while constantly displaying an open hostility toward law enforcement's efforts to safely remove him, we are satisfied that the jury could find beyond a reasonable doubt that McKusick barricaded himself in his car within the meaning of 17-A M.R.S. § 517(1)(A).  *See, e.g.*, *Ferreira v. City of East Providence*, 568 F. Supp. 2d 197, 204, 206 (D.R.I. 2008) (describing a woman as "barricaded in her car" when she remained in her car with a weapon and refused to leave her car for approximately one hour); *Patton*, 2001 WL 112074, at *1, *4 (explaining how a suspect was "barricaded in his vehicle" when he refused to exit his truck as ordered while in possession of a knife and a gun).

C.      **Sufficiency of the Evidence as to 17-A M.R.S. § 517(1)(D)**

[¶25]  McKusick contends that the evidence was insufficient for the jury to find that he failed to leave the barricaded location within a half hour of

14

receiving an instruction to leave. *See* 17-A M.R.S. § 517(1)(D). We conclude that sufficient evidence existed for the jury to find that this element was met.

[¶26] The fourth element that the State must prove under 17-A M.R.S. § 517(1)(D) is that the defendant "fail[ed] in fact to leave the barricaded location within [a half] hour of receiving the instruction [to leave] from a law enforcement officer or law enforcement agency." Under a plain reading of this section, the relevant time is not when a defendant is specifically told that they are creating a police standoff, as McKusick argues, but when the defendant is instructed to leave the barricaded location.

[¶27] Here, the jury heard evidence that the police officers ordered McKusick to get out of his car over two hours prior to the time that they threw the noise flash diversionary device into McKusick's car and arrested him. Therefore, sufficient evidence existed for the jury to find beyond a reasonable doubt that McKusick failed to leave his car within a half hour of receiving the instruction to do so from law enforcement.

The entry is:

        Judgment affirmed.

_____

Kayla M. Alves, Esq. (orally), Paul D. Corey & Associates, P.A., Auburn, for appellant Gabriel R. McKusick

Jacqueline Sartoris, District Attorney, Deborah A. Chmielewski, Asst. Dist. Atty., and Meredith Brown, Stud. Atty. (orally), Prosecutorial District No. 2, Portland, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2023-2495
FOR CLERK REFERENCE ONLY